| Summons | CIVIL DOCKET NO. 2584CV00378 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Stephen J. Hanna as Special Personal Representative of the Estate of Minor D.A., et al    **Plaintiff(s)** vs. Department of Children and Family Services, et al.    **Defendant(s)** | John E. Powers III    Clerk of Courts Suffolk    County |
|---|---|

COURT NAME & ADDRESS:
Suffolk Superior Civil Court
Three Pemberton Square
Boston, MA. 02108

THIS SUMMONS IS DIRECTED TO Fall River Public School System (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the Suffolk Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Suffolk Superior Court Three Pemberton, Sq., Boston, MA 02108 (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's attorney/Plaintiff at the following address: Paula Bliss, Esq.; Justice Law Collaborative, 210 Washington St., N. Easton, MA 02356

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

3. (cont.) Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under Rule 12 of the Massachusetts Rules of Civil Procedure. If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5. Required Information on All Filings.

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. __Michael D. Ricciuti__ , Chief Justice on __Feb 10__ , 20_25_ . (Seal)

Clerk _____

Note: The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ , I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____          Signature: _____

N.B.   TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date:

| Case | CIVIL DOCKET NO. | Trial Court of Massachusetts |
|---|---|---|
| **Summons** | 2584 CV 00378 | The Superior Court |

| CASE NAME: | | John E. Powers III | Clerk of Courts |
|---|---|---|---|
| Stephen J. Hanna as Special Personal Representative of the Estate of Minor, D.A., et al. | **Plaintiff(s)** | Suffolk | County |
| vs. | | COURT NAME & ADDRESS: | |
| Department of Children and Family Services, et al. | **Defendant(s)** | Suffolk Superior Civil Court Three Pemberton Square Boston, MA. 02108 | |

THIS SUMMONS IS DIRECTED TO _Maria Pontes_ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this Summons and the original Complaint has been filed in the _Suffolk Superior_ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

**1. You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the Court may decide the case against you and award the Plaintiff everything asked for in the Complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. If you need more time to respond, you may request an extension of time in writing from the Court.

**2. How to Respond.**

To respond to this lawsuit, you must file a written response with the Court **and** mail a copy to the Plaintiff's attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, _Suffolk Superior_ Court _Three Pemberton Sq, Boston, MA 02108_ (address), by mail, in person, or electronically through the web portal www.eFileMA.com if the Complaint was e-filed through that portal, **AND**

b) Delivering or mailing a copy of your response to the Plaintiff's attorney/Plaintiff at the following address: _Paula Bliss, Esq., Justice Law Collaborative, 210 Washington St, N. Easton, MA 02356_

**3. What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in Court. If you have any claims against the Plaintiff (referred to as "counterclaims") that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Court no more than 10 days after sending your Answer.

**3. (cont.)** Another way to respond to a Complaint is by filing a "Motion to Dismiss," if you believe that the Complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Rule 12 of the Massachusetts Rules of Civil Procedure.** If you are filing a Motion to Dismiss, you must follow the filing rules for "Civil Motions in Superior Court," available at:

www.mass.gov/law-library/massachusetts-superior-court-rules

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at <u>www.mass.gov/courts/selfhelp</u>.

**5. Required Information on All Filings.**

The "Civil Docket No." appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. <u>Michael D. Ricciuti</u>, Chief Justice on <u>Feb 10</u>, 20<u>25</u>. (Seal)

Clerk

**Note:** The docket number assigned to the original Complaint by the Clerk should be stated on this Summons before it is served on the Defendant(s).

---

PROOF OF SERVICE OF PROCESS

---

I hereby certify that on _____, I served a copy of this Summons, together with a copy of the Complaint in this action, on the Defendant named in this Summons, in the following manner (See Rule 4(d)(1-5) of the Massachusetts Rules of Civil Procedure):

_____

_____

_____

Dated: _____         Signature: _____

**N.B.    TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss**                                        **CIVIL ACTION NO.:**

STEPHEN J. HANNA as SPECIAL PERSONAL
REPRESENTATIVE OF THE ESTATE OF
MINOR D.A. and CONSERVATOR FOR MINOR
SIBLINGS M.A. and J.A., IN THEIR
INDIVIDUAL CAPACITY AND AS HEIRS OF
D.A.'s ESTATE,

        Plaintiffs,

v.

DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, DCF SOCIAL WORKERS JOSHUA
PAIVA, CHERYL CHERNECKY, MICHAEL
BRAMMER, CINTHIA JORGE, JEFFREY
DESCHENES, JENNIFER PEREZ, and
UNKNOWN DOES, GOVERNOR MAURA
HEALEY, SECRETARY OF HEALTH AND
HUMAN SERVICES KATE WALSH, ACTING
COMMISSIONER OF DCF STAVERNE MILLER,
FALL RIVER SCHOOLS SUPERINTENDENT
MARIA PONTES, FALL RIVER PUBLIC
SCHOOL SYSTEM,

        Defendants.

kg

## <u>COMPLAINT AND DEMAND FOR A JURY TRIAL</u>

Plaintiffs Stephen J. Hanna as Special Personal Representative of the Estate of Minor D.A.
and as Conservator for Minors J.A. and M.A., in their individual capacity and as heirs of the estate
of D.A., hereby bring this First Amended Complaint and demand for a jury trial against the
Commonwealth of Massachusetts, the Department of Children and Family Services, and the Fall

River Public Schools, including the named employees and other employees, agents, and servants of these entities in their individual and official capacities. Plaintiffs seek compensation, both compensatory and punitive damages pursuant to Massachusetts wrongful death statute, general negligence, violations of Title II of the Americans with Disabilities Act, Constitutional violations and infliction of emotional distress.

## **INTRODUCTION**

This case involves the most egregious failures at nearly every level by the Department of Children and Families ("DCF") and the Fall River Public School System ("FRPS"). As a result of multiple failures, Defendants are responsible for the October 21, 2020 tragic and tortuous death of 14-year-old autistic D.A. and the horrific injuries and abuse to his autistic triplet brothers, M.A. and J.A. From the time that DCF took custody of the children in October 2017, DCF failed to provide appropriate care and protection in violation of its own regulations and consistently ignored numerous warning signs that the children were at risk of further harm. While under DCF supervision and custody, DCF and FRPS had multiple affirmative duties to protect, provide care, supervise, provide accommodations, and to provide clinical evaluation and case planning, among other duties, which they utterly failed to provide for any of these vulnerable autistic boys.

Years before D.A. died in 2020, DCF had been on notice of the grave safety risks the boys faced in the home of the boys' father, John Almond, ("Almond") and his girlfriend, Jaclyn Coleman, ("Coleman"), as they had been removed from their care previously by DCF. DCF and its agents and employees were aware of Almond and Coleman's lifelong history with the Department as once being in custody themselves as children, and later as parents.

After only a few months of the children being in DCF custody, DCF and its agents accelerated the process of reunification prematurely. DCF and its agents were aware that Almond

and Coleman failed to engage in the services and tasks required in their Action Plan to appropriately reunify with the children. Almond and Coleman announced their concerns to DCF that they were not prepared to be reunited as they were not able to find an apartment with an adequate amount of space for the three pre-teens with diagnosis of autism spectrum disorder, two adults and an infant. Service providers also voiced their concerns to DCF that the reunification process was moving too quickly for the children's individual needs. Furthermore, a Juvenile Court judge found Almond unfit to care for the triplets and that the children were still in need of care and protection of the court and DCF. Despite these alarming red-flags and outright warnings, DCF chose to place the boys with Almond and Coleman in an overcrowded one-bedroom apartment in Fall River, MA.

Once the boys were placed back into the home, while still in custody of and under supervision of DCF, the agency and its employees were deliberately indifferent to obvious signs of further physical abuse and neglect that were reported to them multiple times, some by mandated reporters. DCF failed to act on the reports causing the children to endure further trauma and harm.

Between March 2020 and October 2020, D.A. and M.A. were enrolled in FRPS. FRPS utterly failed to provide any, let alone adequate, special education and accommodations incorporated in their Individual Education Plans, or resources to the family. Had they provided educational services to both children and ensured they were in attendance and meeting their educational goals, FRPS would have been alerted to clear signs that the children were living in squalor and being severely neglected and horrifically abused in their home. FRPS utterly failed in their duties to D.A. and M.A., resulting in significant pain and suffering, and ultimately, D.A. premature and wrongful death.

As a result of the negligence of both DCF and FRPS, D.A. suffered a slow, painful death caused by starvation. On October 21, 2020, an emergency response team responded to Mr. Almond and Ms. Coleman's home to find D.A.'s lifeless body in the middle of the deplorable, drug-infested one-bedroom apartment. D.A., along with M.A., who was found also severely malnourished and battered, were taken by ambulance to a local hospital where tragically, D.A. was pronounced deceased at the young age of fourteen years old. These brothers lost their third triplet at only fourteen years of age through the gross negligence, misconduct, and deliberate indifference of the very organizations who were tasked and entrusted with their protection, care and education.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 212, § 4.  This Court has personal jurisdiction over the Defendants pursuant to G.L. c. 258, § 3.

2.     Venue is proper in Suffolk County pursuant to G.L. c. 258, § 3 because one or more of the parties is located in Suffolk County.

## PARTIES

3.     Plaintiff Stephen J. Hanna is a resident of Sumter County, Florida. He is the Special Personal Representative for the Estate of D.A. and is Conservator for minors M.A. and J.A.

4.     Minor decedent Plaintiff, D.A. was a resident of Fall River, Massachusetts prior to his death on October 21, 2020.

5.     Plaintiff M.A. is disabled and is a resident of Essex County, Massachusetts.

6.     Plaintiff J.A. is disabled and is a resident of Norfolk County, Massachusetts.

7.     The Defendant DEPARTMENT OF CHILDREN AND FAMILIES ("DCF") is a state governmental entity doing business at 600 Washington Street, Boston, Suffolk County, Massachusetts.

8.     Defendant MAURA HEALEY is Governor of the Commonwealth of Massachusetts and is sued solely in her official capacity. Pursuant to Part II, Chapter II, Section 1, Article 1 of the Constitution of the Commonwealth of Massachusetts, the executive power of the Commonwealth is vested in the Governor. Under M.G.L. c. 6A §§2 and 4, the governor has the ultimate authority to direct and control the operation of EOHHS and DCF. Governor Healey currently maintains her principal office at the Massachusetts State House, Office of the Governor, Room 280, Boston, Massachusetts, 02133.

9.     Defendant KATE WALSH, Secretary of Health and Human Services for the Commonwealth of Massachusetts and leader of the Executive Office of Health and Human Services ("EOHHS") is sued solely in her official capacity. EOHHS is created under M.G.L. c. 6A §2 and under M.G.L. c. 6A §16 and is vested with the duty to administer the Commonwealth's human services programs, including the child welfare operations of DCF. Pursuant to M.G.L. c. 6A §3, the secretary is the head of EOHHS and is appointed by the governor. Secretary Walsh currently maintains her principal office at One Ashburton Place, 11th Floor, Boston, Massachusetts 02108.

10.     Defendant STAVERNE MILLER is the acting commissioner of DCF and is sued solely in her official capacity. DCF is created under M.G.L. c. 18B §1 and is vested with the duty to administer a "comprehensive child welfare program for children and families." Pursuant to M.G.L. c. 18B §6, the commissioner is the executive and administrative head of DCF, and is appointed by the secretary of EOHHS, with the approval of the governor. Acting Commissioner Miller currently maintains her principal office at 600 Washington Street, 6th Floor, Boston, MA 02111.

11.     Paragraphs 7-10 are collectively referred to as "Commonwealth Defendants."

12.    DCF Social Worker JOSHUAR PAIVA at all relevant times, was employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

13.    DCF Social Worker CHERYL CHERNECKY at all relevant times, was employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

14.    DCF Social Worker CINTHIA JORGE at all relevant times, was employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts

15.    DCF Supervisor MICHAEL BRAMMER, was at all times relevant employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

16.    DCF Supervisor JEFFREY DESHENES, was at all times relevant employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts.

17.    DCF Investigator JENNIFER PEREZ, was at all times relevant employed by DCF, with a business address of 600 Washington Street, Boston, Suffolk County, Massachusetts

18.    Paragraphs 12-18 are collectively referred to as "Individual Defendants"

19.    The Defendant FALL RIVER PUBLIC SCHOOLS ("FRPS") is a local governmental entity doing business at 417 Rock Street, Fall River, MA 02720.

20.    Defendant MARIA PONTES is the superintendent of the FRPS and is sued solely in her official capacity. Superintendent Pontes maintains her principal office at 417 Rock Street, Fall River, MA 02720.

21.    Paragraphs 20-21 are collectively referred to as "FRPS Defendants."

22.    Unknown Does whose identities will only be known after conducting discovery.

*Notice of Presentment Properly Served*

23.     The Commonwealth of Massachusetts, Massachusetts Executive Office of Health and Human Services, Massachusetts Department of Children and Families, the City of Fall River, and Fall River Public Schools, referencing liable officers, employees and agents, have been properly served with a Notice of Presentment within the time limit proscribed by M.G.L. c. 258 §4.

24.     Said presentment was made on October 20, 2022.

## TIMELINESS OF THE ACTION

25.     On October 11, 2023, an action was duly commenced in the Federal District Court for the District of Massachusetts.

26.     On November 19, 2024, the District Court granted the Commonwealth Defendants and the Fall River Public Schools' motions to dismiss based upon form and not merits.

27.     Pursuant to Massachusetts General Law chapter 260, § 32, Plaintiffs have timely filed his current action.

## FACTS

### *The Triplets are In and Out of the Child Welfare and Protection System During their Early Childhood in New York.*



28.     Triplets D.A., M.A. and J.A. were born on February 25, 2006 in Syracuse, New York to Sarah Dawes Almond and John Almond.

7

29.     At age two, the triplets were each diagnosed with autism spectrum disorder.

30.     Soon after birth, the New York Office of Child and Family Services ("OCFS") removed the boys from their parents' custody and placed the triplets with their maternal grandparents, Boy and Linda Dawes, for a short period of time before reunifying them with their parents.



31.     Over the next seven years, the triplets were removed from their parents' custody by the New York Office of Child and Family Services ("OCFS") a total of three times.

32.     These removals stemmed from their parents' substance abuse, deplorable living conditions, medical neglect, inability to provide adequate supervision, and lack of basic care.

33.     During this time, the triplets had reprieve when living with Mr. and Mrs. Dawes for three years.

34.     Almond moved to Massachusetts in 2013 and had very limited contact with his sons who remained in New York OCFS custody.

35.     Following several attempts to reunify the children with their mother, and in an effort to incentivize the mother to engage in services so that the children could be returned to her, the children's attorneys, OCFS counsel, OCFS social workers, and the presiding judge determined the children be placed in non-kin foster home.

36.    Reluctantly, the Dawes had little choice, and were persuaded it would motivate their daughter to engage in services and establish proper housing to reunify their daughter, or them, with their grandsons.

37.    During the transition to a non-kinship placement, the Dawes remained consistent caregivers of the boys and frequently had them in their home unsupervised for weekends, and at times transported them to and from school and to doctors' appointments.

38.    The triplets were able to reunify with their mother for a brief amount of time until OCFS had to remove them from her care for the last time in 2016.

39.    Around the same time, in 2016, the triplets' father, John Almond ("Almond") resurfaced and began visiting with the children and attending court hearings.

40.    All parties, including OCFS, the Dawes, and the presiding New York Family Court Judge agreed that Mr. Almond, now sober and re-engaged in the boys' lives, appeared fit to care for the children.

41.    In September 2016, a New York court awarded Almond full custody of the boys. Shortly thereafter, the Dawes helped transport the children to join Almond in Fall River, Massachusetts.

42.    The boys were enrolled into the Fall River Public Schools and were evaluated for an IEP given their disabilities.

43.    The boys were provided with an IEP that called for significant accommodation to meet their educational needs.

44.    As of September 2016, FRPS knew that the boys were autistic and disabled and required significant accommodations.

***Nine Months Later in 2017 MA DCF Removes the Boys From Almond's Care Due to
Abuse, Neglect, and Unsanitary Conditions***

45.    In June 2017, the Massachusetts Department of Children and Families ("DCF")
received a report of abuse and neglect concerning Almond and Coleman's treatment of the triplets.
The report stated that Almond and Coleman were abusing substances, neglecting to provide the
children with medical care, neglecting to ensure that they attended school, and that there were
unsanitary conditions in the home.

46.    In August 2017, Defendant Joshua Paiva with the DCF Fall River Area Office
("FRAO") opened the current child protection case to monitor the family due to Coleman's
substance use, and concerns for Almond and Coleman's ability to meet the needs of their newborn
and the triplets.

47.    In October 2017, the triplets and their infant brother, G.H. were removed from the
home of Almond and Coleman due to allegations of neglect and physical abuse of the children,
parental substance use, unsanitary conditions of the home, medical neglect, and the triplets'
excessive absences form school.

48.    Upon information and belief, at the time of the removal M.A. had a fractured arm
and J.A. had an injury to his genitals. Both children were transported to a hospital in Rhode Island
to be evaluated by a Forensic Child Abuse and Trauma team.

49.    This marked the fourth time the triplets were removed from parental custody by a
state child welfare agency.

50.    Later DCF moved the boys to the Devereux School, a congregate care placement
for individuals with intellectual disabilities and autism spectrum disorder.

10

51.     Upon removal, Defendant Michael Brammer assigned the family to Defendant social worker Cheryl Chernecky. Defendant Chernecky had already been assigned Ms. Coleman, so was familiar with the family.

52.     In November 2017, Defendant Chernecky conducted a reunification assessment. In the assessment, Defendant Chernecky noted that the boys had significant Autism/delays and are "minimally verbal." Defendant also noted the number of adults living in a one-bedroom apartment and reported Mr. Almond's history of drug abuse, domestic violence and neglect of his children and that the family "desperately needs help in connecting to Community Resources."[1]

### *Throughout 2018 and 2019 Almond and Coleman Make Little to No Progress towards Reunification*

53.     DCF provided Almond and Coleman with a Family Assessment and Action Plan ("FAAP"). The FAAP listed tasks for Almond and Coleman to complete in order to reunify with the children.

54.     The Action Plan required Almond and Coleman to engage in individual therapy to address long-standing substance use and mental health related concerns, submit to random drug tests, participate in family therapy with the triplets, and complete psychological evaluations and parenting classes.

55.     By April 2018, the DCF case management team found that Almond and Coleman made minimal, if any, progress toward reunifying based on a lack of consistent participation in services required by their Action Plan.

---

[1] MADCF_000014 [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

56.    In October 2018, the DCF case management team held a Foster Care Review meeting to discuss whether Almond and Coleman were making progress towards the goal of reunification.

57.    During this review, the facilitator determined that Almond and Coleman had not made sufficient progress on their Action Plan tasks and recommended that the children remain in the care and custody of DCF.

58.    During this month, Defendant Chernecky transferred the family to Defendant case worker Cynthia Jorge.

59.    In a transfer note, Defendant Chernecky noted to Defendant Jorge that Ms. Coleman had a history of sexual abuse both as victim and perpetrator. It was noted that Almond's mother had her children removed due to substance abuse and domestic violence.[2]

60.    Defendant Jorge was also told that the boys were significantly delayed, that Almond had a history of violence and substance abuse, that Coleman hit the boys, that the boys were removed from their custody due to neglect and abuse and substance use.

61.    In January 2019, DCF formally changed the children's permanency plan goal from reunification to adoption due to Almond and Coleman's continual lack of progress and indifference towards the goal of reunification.

62.    In April 2019, DCF held a Foster Care Review where they found that Almond and Coleman had made limited progress towards the tasks listed in their Action Plan and no progress toward others. However, DCF agreed that if Almond and Coleman participated in services for the

---

[2] MADCF_000171 [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

12

next four months, they would consider changing the children's permanency goal back to reunification.

### *Despite Almond Being Entirely Unfit to Care for the Triplets, DCF Moves to Reunify them with Almond and Coleman*

63.    On July 10, 2019, Juvenile Court heard the family's case and issued a finding that Mr. Almond was unfit to care for the triplets and additionally found that the triplets were still in need of care and protection.

64.    The Court's findings ended temporary custody by DCF and made DCF the boys' permanent legal custodian.

65.    Almond did not oppose the finding and stipulated to the boys' permanent custody with DCF.

66.    Despite the Court's decision the day prior, DCF convened a Permanency Planning Conference with Defendant Jorge on July 11, 2019, and changed the triplets' permanency goal from adoption back to reunification.

67.    Just two days later, on July 12, 2019, DCF returned physical custody of G.H., the triplet's infant half-brother, to Almond and Coleman.

68.    At a Foster Care Review meeting in October 2019, the DCF case management team reported that Coleman and Almond were participating in their mandated home-based parenting support service and were visiting the triplets in their congregate care placement.

69.    The Foster Care Review panel recommended that Almond and Coleman could have a home visit by the triplets once they moved into a larger apartment.

70.    At the time, Almond and Coleman were still living in a one-bedroom apartment rented by Almond's mother.

71.   Living in this one-bedroom apartment were Almond, Coleman, Almond's mother Ann Shadburn ("Shadburn") and G.H.

72.   Shadburn had a long history with DCF, including having her own children removed from her care and termination of her parental rights.

73.   Shadburn has a significant criminal history including but not limited to drug possession with intent to distribute, breaking and entering in daylight hours, and sexual conduct for a fee.

| | Case Number | | Case Type | | File Date | | Pending Action |
|---|---|---|---|---|---|---|---|
| ☆ | 15XXCV000054 | | Small Claims | | 02/25/2015 | | Small Claim $501-$2000 |
| ☆ | 0032CR000811 | | Criminal | | 08/21/2020 | | DRUG, POSSESS TO DISTRIB CLASS A c94C §32 |
| ☆ | 6132CR001577 | | Criminal | | 04/23/2001 | | DRUG, DISTRIBUTE CLASS A c94C §32(a) |
| ☆ | 6332CR004039 | | Criminal | | 08/15/2004 | | B&E BUILDING DAYTIME FOR FELONY c266 §18 |
| ☆ | 0032CR005459 | | Criminal | | 06/17/2009 | | CONSPIRACY TO VIOLATE DRUG LAW c94C §40 |
| ☆ | 0932CR006213 | | Criminal | | 10/09/2009 | | RECKLESS OPERATION OF MOTOR VEHICLE c90 |
| ☆ | 9732CR000196 | | Criminal | | 01/09/1997 | | SEXUAL CONDUCT FOR FEE c272 §53A |
| ☆ | 6732CR000164 | | Criminal | | 01/09/1997 | | NIGHTWALKER COMMON c272 §53 |
| ☆ | 6733CR000343 | | Criminal | | 05/23/1997 | | SHOPLIFTING BY CONCEALING MDSE, 3RD OFF |
| ☆ | 9932CR007427 | | Criminal | | 12/07/1999 | | SHOPLIFTING BY CONCEALING MDSE c266 §30A |

74.   Coleman also had a significant violent criminal history stemming from 2011 including five counts of assault and battery with a dangerous weapon.

75.   On October 9, 2019, legal custody of G.H. was returned to Almond and Coleman to that one-bedroom apartment.

76.   The DCF FRAO received an update on December 18, 2019, that Almond and Coleman had been frequently canceling appointments, and the provider was on the verge of recommending cancellation of the service due to Almond and Coleman's inconsistency and lack of engagement.

77.   Additionally, Almond and Coleman frequently cancelled G.H.'s early intervention services.

14

78.     The parenting support service provider told the FRAO staff that they were concerned about Almond and Coleman's ability to meet the triplets' needs if they were sent home.

79.     Despite Almond and Coleman's regression and continued indifference, the DCF FRAO management continued to make the triplets' permanency goal to be reunification at the end of December 2019.

80.     This decision was made by DCF office management without any familiarity with the case and without conducting any administrative review of the case record.

81.     There was no consultation with any of the children's or family's current service providers before making the decision to reunify the triplets.

82.     Nevertheless, DCF set a reunification date for January 2020.

83.     The DCF case management team, congregate care provider and the triplet's collaborative school all independently urged DCF to institute a slower transition.

84.     Multiple parties raised concerns that the small, one-bedroom apartment would cause substantial problems and be a barrier to a safe reunification for the boys.

85.     Despite the Foster Care Review panel previously conditioning a home visit upon Almond and Coleman securing a larger apartment, DCF arranged for D.A., J.A. and M.A. to do a home visit in the one-bedroom apartment.

86.     When DCF brought the boys to Almond and Coleman's apartment on January 10, 2020 for a daytime visit, Coleman told Defendant Jorge that the reunification was moving too fast, that they were not ready, and that the apartment was too small.

87.     This explicit warning and request for help should have been a red flag for the DCF workers; it was not.

88.     Devereux School, where the triplets had been previously placed, also expressed concerns that the boys were still unready for reunification despite their immense progress in their program after their arrival in January 2018.

89.     Devereux requested and advocated for more time for the triplets to transition, stating the boys needed additional time to adjust to a new routine, soothe anxiety, and prevent problem behaviors.

90.     Throughout January 2020, DCF reported that Almond and Coleman cancelled further visits by the triplets, cancelled parent support appointments, and put in no work to get a larger apartment.

91.     DCF delayed reunification for one month to February 2020.

92.     Although Almond and Coleman displayed further regression in their Action Plan tasks and had not secured a larger apartment (or even begun searching for one), DCF brought the triplets to Almond and Coleman's overcrowded apartment for an overnight visit on February 7, 2020.

93.     The boys were also transported to Henry Lord Middle School to meet with Ashley Cabral who would be their teacher in the FRPS. The boys also toured the classroom where they would go to school.

94.     During this overnight visit, Almond and Coleman reported that there was a physical altercation with J.A. in which Almond restrained him.

95.     Coleman called Defendant Jorge and left a message at 1:00am that J.A. needed to be picked up.

96.     The police were called to the apartment. J.A. was picked up by Devereux in the middle of the night and returned to the facility where he stated he was happy.

16

97.     J.A. pled with the Department not to return him to the apartment.

98.     Reunification plans continued with an annual IEP meeting

99.     Following this, Devereaux attempted again to request more time for the children to be able to transition due to their disabilities and their difficulties with coping with transitions.

100.     An annual IEP meeting was held on February 13, 2020, in anticipation of the boys' transfer to FRPS. Several members of the boys' educational team were present including Ahsley Cabral, the FRPS special education teacher.

101.     On February 13, 2020, Devereux pleaded with DCF not to move forward with reunification as they feared a "significant negative impact on their wellbeing."

102.     Given their concerns, Devereux sent DCF an email to "formally note" their concerns that they had discussed with DCF. In the email, Devereux recapped the conversation with DCF stating the following:

   a.  The boys would be moving into a very small one-bedroom apartment, and the boys would be sleeping on the floor;

   b.  The landlord had sent the family an eviction notice should the boys be moved into the apartment. DCF thought this was a good idea and would promote getting a larger apartment. DCF didn't believe the landlord.

   c.  There is a new baby in the apartment and since the boys have Autism (moderate to severe) they would be over-stimulated to their detriment;

   d.  DCF's "back-up" plan was for the family to go to a homeless shelter if evicted;

   e.  The boys will have to attend public school and thus may be being set up for failure without appropriate accommodations;

103.     Devereaux also recommended that the children not transition home until they are able to engage in Applied Behavioral Analysis services, which would have been another provider in the home to monitor the family who was a mandated reporter.

17

104.    However, DCF only delayed reunification another month and did not ensure that services were in place, nor that the family had moved into a larger apartment prior to reunifying.

105.    J.A. remained in his congregate care placement and in DCF custody due to his own self-advocacy and his refusal to return to the care of Almond and Coleman.

106.    Defendant Jorge was told on February 19, 2020 that J.A. did not want to go to Coleman and Almond's home even for a visit as he felt he was unable to remain safe. Defendant Jorge also learned that J.A.'s concerns were echoed by the family.

107.    While DCF dismissed and pathologized his self-advocacy as a stereotype of autism, J.A.'s self-advocacy saved him from starvation, abuse, and neglect, and likely saved his life.

108.    DCF failed to consider the physical altercation and J.A.'s strong reaction against being placed in the apartment and moved forward with leaving D.A. and M.A. in the home.

109.    The week following the overnight visit, the triplets' congregate care providers at Devereaux sent a strongly worded letter to DCF opposing the decision to reunite the triplets with Almond and Coleman on the basis (i) that the physical environment of the home was inadequate to meet the children's therapeutic needs, (ii) that Almond and Coleman were facing eviction, and (iii) that the children needed a transition plan that appropriately accommodated their disabilities and provided for a safe transition.

110.    DCF held a discussion with the congregate care provider and the reunification date was delayed another month.

111.    On March 10, 2020, Governor Baker declared a state of emergency in response to the beginnings of the COVID-19 pandemic.

*DCF Flagrantly Disregards Explicit Safety Warnings by Enacting an Expedited Reunification Process Which Thrust the Boys into a Dangerous, Abusive, and Neglectful Home Where Their Most Basic Needs Were Never Met and They Were Horrifically Tortured and Abused.*

112.    DCF placed D.A. and M.A. in the physical custody of Almond and Coleman on March 13, 2020.

113.    DCF retained legal custody of the two boys.

114.    D.A. and M.A. had been doing well in their congregate care placement and were in good health and at a healthy weight when they were handed over to Almond and Coleman.

115.    DCF turned custody of the two boys over to Almond and Coleman even though they still had not addressed the serious concerns regarding their living situation and were still in an overcrowded one-bedroom apartment with three adults and now two adolescents and an infant.

116.    DCF turned custody of D.A. and M.A. over to Almond and Coleman even with the knowledge that they were facing eviction and had expressed concerns about their ability to care for D.A. and M.A.

117.    DCF turned custody of the two boys over to Almond and Coleman despite not having adequate therapeutic home-based services or accommodations in place for the boys.

118.    DCF turned custody of the two boys over to Almond and Coleman knowing that that the parenting support service was on the verge of terminating services with the family for non-participation.

119.    DCF turned custody of the two boys over to Almond and Coleman knowing that isolation due to the COVID epidemic could make the living situation even more dangerous.

120.    No DCF personnel is able to articulate any clear reason why D.A. and M.A. were reunified with Almond and Coleman.

19

121.    There were adequate funds in the Fall River Area Office's budget to continue the triplet's congregate care placement.

122.    Despite the high-risk factors and warning signs, the boys' case management team ceased doing in-person visits and changed to highly ineffective monthly virtual home visits.

123.    On March 20, 2020, DCF was notified that the family's in-home continuum service — the intensive in-home service the amended transition plan offered in the absence of more specialized developmental and disability services — would be going entirely remote.

124.    Soon after, the Fall River Public Schools and the parenting support service provider went remote as well.

125.    The avoidance of contact with providers and more so with the Department, should have heightened Defendant Jorge and the Department's vigilance and should have triggered the need for an emergency, unannounced home visit to check on the safety and wellbeing of the children, who were still in their legal custody.

126.    Instead, Defendant Jorge and the Department relied on virtual home visits from March to September 2020, limiting their ability to see and interact with the children and limiting their ability to view the conditions of the home.

127.    During this time, Coleman lied about the family's access to adequate and reliable technological service while utilizing technology to contact other providers from whom DCF was receiving regular reports.

128.    No one from FRPS followed up to ensure the boys had access to their education.

129.    Several of these concerns were either missed or disregarded by the Department and FRPS throughout the months the children were home resulting in tragic circumstances.

130.    Similarly, FRPS did not take any action to mitigate D.A. and M.A's doubly destabilizing experience of transitioning to their father's apartment during a pandemic.

131.    Although FRPS conducted remote learning through the Spring of 2020, they had no engagement with D.A. or M.A.

132.    FRPS neither received work nor contact from the boys nor provided any services.

### DCF Approves Continuing Physical Custody of M.A. and D.A. Despite Reports of Multiple Physical Injury, Apparent Control and Manipulation of the Boys by Coleman, and Reports of Increasing Distress.

133.    In March 2020, Coleman reported to the continuum provider that D.A. was exhibiting "challenging behaviors". But in April 2020, she reported to the DCF case management team that there were no concerns regarding the children's behavior.

134.    Although the DCF case management team is mandated to collect and review reports from the children and family's other providers, DCF failed to respond appropriately to the increasing reports of injury and distress.

135.    In mid-May 2020, the DCF case management team sought to conduct a virtual home visit.

136.    Coleman declined to have the visit citing technological issues and told the case management team that D.A. had vomited from having too many snacks and was lying in a pool of his own vomit.

137.    The DCF case management team failed to make any inquiry into this concerning report about D.A.'s health and well-being.

138.    Ten days later, when the DCF case management team did have a virtual home visit, Coleman controlled D.A. and M.A.'s communication with the DCF case management team by prompting them to provide specific answers to DCF's questions.

139.    DCF failed to intervene to ensure the boys were able to speak honestly and openly with them and to question or prevent Coleman from obstructing conversation and supervision.

140.    Autism spectrum disorder is a disability which can impact communication and requires appropriate accommodations often including providers who can be patient and have superb attention to detail.

141.    In May 2020, the family's parenting support provider terminated services for Coleman and Almond due to their refusal to participate in services.

142.    In June 2020, the continuum provider reported to the DCF case management team that Almond physically restrained D.A., that Coleman reported D.A. had displayed aggression, and that the family were requiring D.A. to scrub the floor with a toothbrush as one of his punishments.

143.    Defendant Jorge and DCF, for the second time, ignored a report of a physical altercation within the home.

144.    This report was particularly concerning given that D.A. had never shown aggression at his congregate care placement.

145.    During a second update in June 2020, the family's continuum provider reported to the DCF case management team that Coleman said she was fearful of being attacked by the boys and that D.A. was refusing to take his medication.

146.    However, she and Almond refused to contact the Mobile Crisis line that the continuum provider had suggested. Concerned, the service providers strongly suggested the need for the Department to conduct visits with the family in their home.

Date Filed 2/10/2025 6:07 PM
Superior Court - Suffolk
Docket Number

147.     According to the Department's Ongoing Casework and Documentation Policy, *"The schedule of contacts should include at least monthly visits by Social Worker with the child (ren), the child (ren)'s placement resource and the child (ren)'s parents."*

148.     The continuum provider urged the DCF case management team to see the family in-person.

149.     However, the DCF case management team did not pursue in-person visits when Coleman declined to meet outside of the home citing COVID-19 fears.

150.     During DCF's June 2020 virtual home visit, Coleman restated that D.A. had displayed "oppositional behaviors" but stated she did not feel overwhelmed.

151.     The Defendant Jorge and the DCF case management team failed to inquire into the physical altercation within the home, the reason for these "oppositional behaviors", or to appropriately check in with D.A. and M.A.

152.     During this June 2020 visit, when a DCF worker tried to ask D.A. and M.A. whether they had been brought to see J.A. at the congregate care setting, Coleman interrupted and prevented them from answering.

153.     Defendant Jorge asked again, and D.A. and M.A. said they wanted to see their triplet brother.

154.     This was not the first-time individual defendants observed Coleman control the boys' communication.

155.     The DCF case management team failed to appropriately address Coleman's obstruction of their assessment and supervision and further failed to provide appropriate accommodations and developmentally appropriate opportunities for communication in order to ensure that D.A. and M.A. could meaningfully participate in supervision.

23

156.     Social workers also failed to facilitate visits with all three brothers since J.A.'s displacement back in March 2020.

157.     DCF policy requires visits.

158.     On June 17, 2020, the Foster Care Review panel met and inexplicably found that Coleman and Almond were meeting D.A. and J.A.'s needs and that they were participating in continuum services.

159.     Between June and July 2020, Almond and Coleman failed to increase participation in continuum services and conflict and behavior challenges continued.

160.     On July 17, 2020, despite the fact that the DCF case management team had not appropriately conducted a visit to monitor the boys' well-being and had watched Coleman prevent them from speaking openly with the DCF workers, despite Almond and Coleman's refusal to participate in services, and despite reports of conflict in the home and physical altercations, the DCF FRAO office inappropriately recommended that the Juvenile Court should return legal custody of D.A. and M.A. to Almond.

161.     Almond didn't even appear for the hearing.

162.     DCF was aware the family had made no effort to get into a bigger home and was still living in a one-bedroom apartment, the insides of which DCF hadn't seen for months.

### *Increased Signs of Distress, Physical Injury and Sickness, and Limited Participation by Almond and Coleman Didn't Stop DCF From Returning Legal Custody of D.A. and M.A. to Almond.*

163.     The Juvenile Court returned legal custody of D.A. and M.A. to Almond and determined that the DCF Fall River Area Office should continue supervision of the family.

164.     That same day, on July 17, 2020, Coleman refused to allow DCF staff to meet with her, D.A., and M.A. outside of the home saying they had been exposed to Covid and further refused to have a virtual visit.

24

165.    This refusal should have been a red flag for DCF, particularly because Coleman had shared with DCF workers that the family had engaged in other activities bearing significant risk of Covid exposure.

166.    The DCF case management team allowed Coleman to refuse the visit despite their duty to supervise the well-being of D.A. and M.A.

167.    On July 22, 2020, at the rescheduled home visit, the DCF case management team observed Coleman berate D.A. for behaviors she said he was "purposefully and defiantly exhibiting."

168.    DCF case management failed to make a developmentally appropriate intervention.

169.    Instead, DCF case management watched D.A. explain that he was embarrassed and upset and then shut down and stop talking.

170.    D.A.'s brother M.A. tried to advocate for his brother and provided further information to the DCF case management team that was contrary to Ms. Coleman's version of events.

171.    Coleman stated that M.A. was "making her look like a liar."

172.    Despite noting deception and verbal abuse by Coleman, conflict in the home, and two boys in their supervision expressing distress, the DCF case management team failed to appropriately intervene or conduct further inquiry and investigation.

173.    In August 2020, the continuum service provider alerted the DCF case management team that Coleman reported D.A. had scratched his collar bone until it had become raw.

174.    Despite knowing that this child under their supervision had sustained a physical injury which, if Coleman's version of events was true and it was self-inflicted, indicated that D.A.

was experiencing significant distress, DCF case management failed to follow up with D.A. or anyone in the family about this injury.

175.    On August 24, 2020, Defendant Jorge knew that DCF had not seen the inside of the home since the Covid quarantine began and knew that the family even refused "sidewalk visits."[3]

176.    It is highly negligent for DCF to fail to follow up on a report of a physical injury sustained by a child under their supervision.

177.    Further, DCF failed to provide appropriate accommodations for D.A. by ignoring such a sign of distress from a young person diagnosed with autism spectrum disorder.

178.    According to The National Library of Medicine:

"Children with disabilities are at heightened risk for maltreatment, a significant public health problem referring to experiences of abuse (physical, sexual, or emotional) and/or neglect that are associated with deleterious outcomes across the lifespan"

"Children with [autism spectrum disorder ("ASD")] and abuse may show heightened behavioral difficulties, such as aggression, self-injury, tantrums, and fears, compared to children with ASD without abuse.

179.    Red flags continued to be raised and blatantly ignored by DCF and the FRPS.

180.    On August 21, 2020, the DCF FRAO received an anonymous abuse and neglect report warning that the conditions of the family's home were deplorable, that Coleman and Almond were engaging in dangerous substance abuse and that Shadburn has a significant criminal history.

181.    The DCF Fall River Office failed to accept this report for investigation.

182.    Instead, the case management team conducted an inadequate virtual home visit three days later.

---

[3] MADCF_000311 [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

183.    At the August 24, 2020 virtual home visit, following the abuse and neglect report, Defendant Jorge observed that D.A. had a bandage covering his nose.

184.    Coleman stated that D.A. had a self-inflicted injury and DCF watched her instruct D.A. on what to say to Defendant Jorge.

185.    This was the third time Defendant Jorge failed to recognize a physical injury as a "serious safety and welfare concern" and made no inquiry into the physical injury or D.A.'s distress.

186.    At this meeting, Defendant Jorge's only inquiry into the abuse and neglect report was to ask Coleman whether the report had merit.

187.    Coleman denied the report stating that they were having issues with a neighbor and the report had no merit.

188.    Despite D.A.'s observable injury, an external abuse and neglect report which mirrored the problems raised in prior reports, alarms raised by providers, behaviors that a disability-informed and accommodating team would flag as severe distress, and watching Coleman coach and berate the children, the DCF individuals chose to accept Coleman's word.

189.    The DCF case management team failed to investigate this abuse and neglect report. They made no appropriate assessment of the substance abuse reports and accepted Coleman's self-reported sobriety as truth.

190.    The DCF case management team further failed to appropriately assess the conditions of the family's home.

191.    One of the initial concerns that DCF and other providers raised in the reunification process was the challenges that a one-bedroom apartment would pose to a family with three adults,

an infant, and two adolescent boys with Autism. It was a significant failure that the team did not examine the home.

192.    On September 14, 2020, Coleman and Almond brought M.A. to the hospital in Rhode Island for an injury that she reported was, again, self-inflicted.

193.    The injury was serious enough that M.A. was admitted overnight for observation and discharged the next day.

194.    The DCF case management team conducted their final virtual home visit on September 25, 2020.

195.    D.A. was on video and refused to speak. Defendant Jorge failed to follow up with a boy who was in clear distress in a developmentally appropriate way.

196.    Given that just three weeks later D.A. died of starvation after losing over 60 pounds and that M.A. was in similarly dire shape and close to death, it is incomprehensible how the individual defendants on video with the boys for the purpose of ascertaining their well-being failed so gravely in their duty.

197.    During this visit, Coleman further stated that D.A. was having behavioral issues and expressed concern about these behaviors.

198.    Despite the numerous reports that Coleman and others had made regarding behaviors which warranted additional inquiry and intervention, DCF failed to make appropriate follow-up.

199.    DCF knew between September 20 and October 3, that Almond and Coleman failed to attend any continuum appointments.

200.    On October 5, 2020, DCF knew that the boys had not attended school and had not picked up schoolwork or Chromebooks as Almond had promised to do.

201.    On October 14, 2020, Defendant Jorge received a call from the boys' math and science teacher stating that the boys had not attended any days of school.

### *Fall River Public Schools Utterly Fails D.A. and M.A.*

202.    By law, students are required to attend school in Massachusetts.

203.    Prior to being reunified with their father, the boys attended school at Devereux overseen by the Wachusett Regional School District.

204.    On January 24, 2020, the boys had a reevaluation of their IEP plans by Devereux.

205.    An Individualized Education Program (IEP) is a plan specifically tailored for specialized instruction, supports, and services to meet the individual needs of a student with a disability.

206.    All three boys had an IEP as of January 2020.

207.    Pursuant to 603 CMR 28.03(1)(c):

*"Change of residence.*

*When an eligible student or student's family changes residence from one Massachusetts school district to another, the last IEP written by the former school district and accepted by the parent shall be provided in a comparable setting without delay until a new IEP is developed and accepted."*

208.    603 CMR 28.05(4) states:

*Upon determining that the student requires special education and based upon the evaluation data, the Team shall write an IEP for the student and decide the student's placement. The IEP shall describe the special education and related services that the student requires and shall include all elements required under federal and state law.*

209.    FRPS did not convene to develop its own IEP for the boys, nor did the district seek to re-evaluate the boys.

29

210.    FRPS knew that the boys qualified for special education services under their diagnosis of autism spectrum disorder as they had been enrolled in the district before and were under an IEP with FRPS.

211.    Upon transferring to FRPS, FRPS knew that the boys remained under an IEP as it was transferred by Devereux.

212.    The educational transfer of M.A. and D.A. was planned by Devereux and FRPS and met the expectations of transitioning special education students.

213.    The boys were enrolled students with the Fall River Public School system at Henry Lord Middle School.

214.    In September 2020, the boys were promoted to Durfee High School.

215.    Between March through October 2020, D.A. and M.A. were enrolled students with the Fall River Public School system.

216.    D.A. and M.A., as students with autism, had a substantive right to receive a free and appropriate public education ("FAPE") that complied with the requirements of federal and state law.

217.    As special education students enrolled in the Fall River Public Schools, the Fall River Public Schools owed D.A. and M.A. a non-discretionary duty to provide them with special education services required under federal and state law.

218.    Despite this clear, non-discretionary duty, the Fall River Public Schools, including their employees and agents, failed to provide the boys with the special education services to which they were entitled.

219.    Although Fall River Public Schools staff had contact with Coleman, school staff never saw or spoke with D.A. or M.A.

220.    Neither D.A. nor M.A. received any academic instruction or related special education service during the seven months in which they were enrolled in the Fall River Public School system.

221.    FRPS did not implement any guidance regarding special education, student outreach efforts, or remote learning expectations for the boys during the COVID 19 pandemic.

222.    FRPS knew that the boys were "high risk students" and should be prioritized for in-person learning.

223.    High risk students included students with disabilities, students who do not have reliable internet or suitable learning space in their homes, students who are behind academically, students who are disengaged and/or who struggled during the previous remote learning periods.

224.    The failure to make any direct or virtual connection with D.A. and M.A. deprived these two autistic children of any ability or opportunity to engage with their teachers and support staff at school so that, at a bare minimum, those school employees would see what was very obviously there to be seen – two severely malnourished, abused, and neglected special needs children who had no ability to advocate for themselves.

225.    This choice of FRPS and its employees directly ensured that they, as the providers legally responsible for documenting the educational, social, and emotional growth of these boys in their school, would never be able to observe, document, and report the obvious changes that were occurring with the boys' physical, emotional, and educational well-being.

226.    Had FRPS and its employees complied with their obligations in providing special educational services for these boys, what they observed most certainly would have given the school and its employees reasonable cause to believe that each child was suffering from severe abuse and neglect.

227.    On October 1, 2020, a Fall River Public Schools Attendance Officer dropped off Chromebooks at the apartment.

228.    No other contact was ever made with the boys.

229.    A teacher with FRPS did, however, contact the DCF case management team on October 5, 2020, and again on October 14, 2020, and thereby notified DCF that D.A. and M.A. were not logging into school.

230.    FRPS took no further action whatsoever to assure D.A. and M.A. were receiving education.

231.    FRPS admitted that they never attempted to speak with D.A. or M.A. to gauge how the boys were faring despite no evidence of school participation.

232.    There is no evidence that D.A. or M.A. ever did any schoolwork virtually or through paper packets from March 2020 to October 2020.

233.    FRPS took no steps and failed to respond when faced with this evidence of no participation.

234.    FRPS failed to recognize the boys' lack of engagement within the context of their individual needs and disabilities.

235.    FRPS special education staff did not take any action to mitigate D.A. or M.A.'s doubly destabilizing experience of transitioning to their home environment after years in residential placement and suddenly losing all educational structure and supportive contact.

236.    FRPS knew or should have known that children with autism are especially susceptible to difficulties with transitions and need to be monitored extremely closely.

237.    FRPS failed to give D.A. and M.A. no credit due to lack of engagement and failed to report child neglect based upon the family's unreasonable refusal to facilitate any educational engagement for the boys.

238.    FRPS failed to provide D.A. and M.A. with free and appropriate public education because D.A. and M.A. never received any academic instruction or related special education service.

239.    FRPS failed to provide D.A. and M.A. with any special education services.

***D.A.'s Excruciating Death Was Entirely Avoidable Had Defendants Done Their Jobs***



240.    Just seven days after a teacher contacted DCF, early in the morning of October 21, 2020, the Fall River Police Department received a 911 call concerning an unresponsive child located at 107 Green St.

241.    First responders arrived to find D.A. and M.A. emaciated, battered and abused, and severely neglected in a filthy, overcrowded one-bedroom apartment riddled with drug paraphernalia and hundreds of glassine baggies with traces of fentanyl and heroin.



242.    D.A. was unresponsive and wearing a diaper filled with his own waste.

243.    According to the Fall River Police Report, paramedics started CPR on D.A. while in the home but realized he was in grave condition.

244.    Paramedics thankfully decided M.A. was "too malnourished to leave behind"[4] and was emergently taken in a separate ambulance to Charlton Memorial Hospital where his life was saved.



---

[4] Fall River Police Report from 10.21.2020 [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

245.     Dr. Joseph Tondreau of Charlton Memorial Hospital pronounced D.A. deceased at 8:29 am on October 21, 2020.

246.     D.A. was just 14 years old.

247.     Dr. Katie Chapman informed officers that M.A. also appeared to be emaciated and suspected he had been severely neglected. When M.A. asked when the last time he ate was, Coleman answered for him.

248.     Massachusetts State Police Trooper Thomas Loughan of the MSP Crime Scene Service Section, photographed D.A. as he lay deceased in a hospital gurney:



249.     D.A. was in an adult-sized diaper that appeared to be saturated in fecal matter, indeed, D.A.'s body from his head to knees was also covered in his waste.

250.     D.A. had bruises on both hands, both feet, left ankle and both knees, and he had cuts on both ears and a scrape on his shoulder blade.

251.    D.A. was emaciated, appearing to weigh a total of 80 pounds.

252.    Charlton Memorial team as well as the officers contacted DCF and filed reports of the abuse and neglect of the children.

253.    Both Almond and Coleman were escorted to the Fall River Police Department to be interviewed, unfortunately it was too late for D.A.

254.    During Coleman's interview, officers learned that both M.A. and D.A. had tested positive for Fentanyl.

255.    Coleman and Almond were arrested.

256.    Coleman was charged with Neglect of a Disabled Person, Intimidation of a Witness, Assault and Battery on a Police Officer and Possession of a Class A Drug. Almond was charged with Abuse of a Disabled Person and Possession of a Class A Drug.

257.    M.A. was placed back into the custody of DCF.

258.    At the time of D.A.'s death in October 2020, after being with Amond and Coleman for just seven months, D.A. had lost sixty pounds and was well-below the average weight of a well-nourished fourteen-year-old child.

259.    The Office of the Medical Examiner ruled that D.A.'s cause of death was "Failure to Thrive and malnutrition due to starvation and neglect in an adolescent with autism spectrum disorder" and ruled his death a homicide.

### *The Office of Child Advocate Investigation finds DCF and FRPS at Fault*

260.    Shortly after the death of D.A., the Office of Child Advocate ("OCA") began an investigation into the individual and systemic failures that led to the abuse and neglect suffered by J.A., M.A. and D.A. and the resulting death of D.A.

261.    On March 31, 2021, the OCA published its findings with twenty-six recommendations for policy, procedure and practice improvements.

262.    The OCA investigation resulted in an over 100-page scathing investigative report ("OCA Report" or "Report") addressing the multiple failures, gross negligence, recklessness, and callous indifference of the Defendants.

263.    Indeed, the OCA found that D.A.'s tragic death, and the triplet brothers' abuse and injuries, were the result of failures at nearly every level by DCF and FRPS, stating in short:

> families who come to the attention of DCF bring complex problems and often multi-generational histories of trauma, poverty, and discrimination. The decisions made by and recommended to courts by child protective workers carry life-long consequences for the children and their families...Although neglect cases far outnumber cases of abuse, children can be seriously injured or die if their caretakers do not have the capacity to care for them. **The child protective system has many built-in safeguards, both internal and external to DCF. All of these safeguards failed [D.A.] and resulted in his untimely death**. (emphasis added).

> ***

> FRPS and their staff worked diligently to create effective plans for the district to provide remote and hybrid learning in the pandemic. It is this diligent work by the district that makes the experience of [D.A. and M.A.] particularly distressing from a systems analysis viewpoint because **these children fell through the safety net at every critical juncture**... **resulted in amplified risks** to D.A. that went unaddressed by FRPS. D.A. was never seen by, or spoken to by, any school employee from March 2020 to the time of his death in October 2020.

264.    A summary of other findings from the OCA include:

a.  D.A. died from child abuse and neglect.

b.  Children with disabilities are at least three times as likely to be maltreated than their peers without disabilities, and they are more likely to be seriously injured or harmed by abuse or neglect. The OCA has determined that D.A. and M.A.'s disabilities played a critical role in this situation, as their disabilities were intimately tied to their vulnerabilities.

c.  All entities working with the family failed to understand that Almond's and Coleman's active and persistent steps to keep D.A. and M.A. out of sight from DCF and the school officials was a purposeful effort intending to conceal the severe neglect and abuse that both children suffered.

37

d.  The DCF case management team did not re-examine the immediate post-reunification risks based on the family's avoidance of contact, the DCF management team's inability to visit the home, and the immediate lack of in-person service provision.

e.  The DCF team did not observe the children, the home, or Almond or Coleman between June 19, 2020 and July 17, 2020.

f.  The DCF management team did not at any time seek to interview D.A. or M.A. outside the presence of Coleman.

g.  The FRPS never saw or spoke with D.A. or M.A. from March 16, 2020, when they were scheduled to begin school, to the time of D.A.'s death.

h.  DCF Fall River office failed to gather sufficient information prior to reunification.

i.  DCF Fall River office did not have cause to change the children's permanency goal from adoption back to reunification.

j.  DCF Fall River office failed to adequately estimate Almond and Coleman's substance use.

k.  DCF Fall River office failed to evaluate Almond's capacity to be the educational decision maker for the boys.

l.  DCF's decision to screen out an August 21, 2020, report of neglect was a failure and a violation of the DCF Protective Intake Policy.

m.  DCF failed to address safety concerns with Shadburn.

n.  DCF Fall River failed to possess the basic knowledge and understanding of autism spectrum disorder that significantly impacted their ability to make decisions in the boys' best interest.

o.  The reunification process started in December 2019 was not appropriate considering the facts at their disposal.

p.  DCF area office "appeared willing to accommodate slight delays in the reunification plan but unwilling to fundamentally rethink the plan despite the serious concerns brought to their attention."

q.  DCF Fall River area office did not secure the recommended essential services for D.A. and M.A. thus they received zero individual services during the seven months while in the home.

r.  DCF failed to recognize the physical environment of the home did not meet the needs of the triplets.

s.  DCF failed to recognize D.A.'s clear physical and emotional deterioration between March 13, 2020, and his death.

t.  FRPS failed to pursue protective measures considering multiple red flags as to the safety of D.A. and M.A.

u.  FRPS failed to visually observe either child while enrolled.

38

v. FRPS failed to properly ensure mandated reporter responsibilities were being followed.

### *Vicarious Liability Exists for All Front-Line Workers*

265. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth here in their entirety.

266. The conduct and omissions detailed herein were committed by employees and/or agents of the DCF and FRPS Defendants.

267. The Defendants and their employees and/or agents were acting within the scope of their employment or agency and under the color of state law.

268. At all times relevant, the Defendants had the ability to control the conduct of the employees and/or agents in the course of their employment and/or agency.

269. As such the Defendants are vicariously liable for the wrongful acts and omissions of their employees and/or agents that caused D.A., J.A. and M.A. discrimination, serious injury and death.

### <u>COUNT I</u>
### *Wrongful Death of D.A. (Mass. Gen. Laws ch. 229, §2)*
### *Personal Representative of the Estate of D.A. v. DCF Defendants*

270. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth here in their entirety.

271. On or about August 2017, the DCF Defendants removed D.A. from his parent and assumed care and custody of D.A.

272. DCF Defendants assumed the role of *in loco parentis* over D.A.

273. DCF Defendants owed D.A. a duty of care at all times relevant.

274.    In or about March 2020, DCF reunified D.A. with his biological father and his girlfriend, despite repeated warnings, red flags and failures of the parents to engage in any pre-conditions that would support reunification.

275.    DCF Defendants breached their duty to D.A. to reasonably supervise, monitor and protect him.

276.    DCF Defendants had actual knowledge of a substantial risks of serious harm well prior to D.A.'s death.

277.    Notice of serious and heightened risks included, but are not limited to:

    a.  Repeated removal of the boys from parental custody;

    b.  Parental substance abuse;

    c.  Failure of Coleman and Almond to engage in necessary parental services and conditions;

    d.  Criminal history of adults living in the home with the boys;

    e.  Prior DCF involvement with adults living in the home with the boys, including a history termination of parental rights;

    f.  Repeated instances of physical injury with the boys;

    g.  Pleading by J.A. to not return to the care of Almond and Coleman;

    h.  Never investigating the inside of the residence;

    i.  Failure of Almond and Coleman to move the boys into a larger home;

    j.  Notifications from Coleman that they were not ready for reunification;

    k.  Possible eviction of Almond and Coleman;

    l.  Failure of Almond and Coleman to appear for Court hearings;

    m.  Repeated anonymous reports of neglect, drug use and abuse; and

    n.  Repeated concerns raised by Devereux school.

278.    Despite being aware of the aforementioned dangerous conditions, DCF placed D.A. within the care of Almond and Coleman.

279.    DCF Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

    a.  The duty to reasonably supervise, monitor, and communicate with the triplet brothers;

    b.  The duty to recognize and respond appropriately to a multitude of clear signs of abuse and neglect;

    c.  The duty to reasonably perform clinical formulation, assessment, case planning, make reasonable case decisions, and ensure effective provision of services;

    d.  The duty to facilitate reasonable transition;

    e.  The duty to identify and locate kin, to prioritize kinship placement and to provide notice of removal to kin;

    f.  The duty to provide the boys with notice of their rights before service reduction and termination;

    g.  The duty to refrain from disability discrimination and to provide equal opportunity to benefit from programs, supports and services;

    h.  The duty to ensure access to healthcare; and

    i.  Additional negligence, gross negligence, and recklessness.

280.    DCF Defendants failed to exercise due care and violated multiple affirmative duties including but not limited to:

    a.  Monthly supervision requirements under 42 U.S.C. § 624 (f)(1)(A);

    b.  Providing reasonable communication accommodations and assistance in violation of 29 U.S.C. 794; CFR 35; the Americans with Disabilities Act of 1990; and 110 CMR 1.08-1.09;

    c.  Maintaining meaningful contact with the children pursuant to 110 CMR 1.02; and

    d.  Assuring the boys that they were entitled to the care and protection of DCF while under their legal custody and supervision.

281.    As a result of their failure to intervene and remove D.A from the care of his biological father and his girlfriend, and it being foreseeable that D.A. would be exposed to grave danger if he was allowed to remain in this environment, DCF Defendants breached their duty to D.A. to reasonably supervise, monitor and protect him.

282.    As a result of breaching the duty of care owed to D.A. by placing D.A. in this dangerous environment, DCF defendants proximately caused the injuries and death of D.A. DCF Defendants' affirmative acts and omissions constitute gross and wanton conduct.

283.    DCF Defendants' gross and wanton negligence caused D.A.'s severe pain and suffering and death which was a reasonably foreseeable result of DCF Defendants' failure to perform their duties.

## COUNT II
### *Negligence*
### *J.A. and M.A. v. DCF Defendants*

284.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

285.    On or about August 2017, the DCF Defendants removed J.A. and M.A. from their parent and assumed care and custody of them.

286.    DCF Defendants assumed the role of in loco parentis over J.A. and M.A.

287.    DCF Defendants owed J.A. and M.A. a duty of care at all times relevant.

288.    DCF Defendants, as the children's legal custodian and supervisor, has the duty to protect children entrusted to their care from foreseeable risks of harm, including harm which would likely result if they were placed into a previously abusive home where there was insufficient and ineffective mitigation of risk to the children of which DCF Defendants had knowledge.

289.    In or about March 2020, DCF reunified D.A., J.A. and M.A. with their biological father and his girlfriend, despite repeated warnings, red flags and failures of the parents to engage in any pre-conditions that would support reunification.

290.    DCF Defendants breached their duty to J.A. and M.A. to reasonably supervise, monitor and protect them.

291.    DCF defendants had actual knowledge of a substantial risks of serious harm well prior to D.A.'s death.

292.    Notice of serious and heightened risks included, but are not limited to:

    a.    Repeated removal of the boys from parental custody;

    b.    Parental substance abuse;

c.  Failure of Coleman and Almond to engage in necessary parental services and conditions;

d.  Criminal history of adults living in the home with the boys;

e.   Prior DCF involvement with adults living in the home with the boys, including a history termination of parental rights;

f.  Repeated instances of physical injury with the boys;

g.  Refusal by J.A. to return to the care of Almond and Coleman;

h.  Never investigating the inside of the residence;

i.  Failure of Almond and Coleman to move the boys into a larger home;

j.  Notifications from Coleman that they were not ready for reunification;

k.  Failure of Almond and Coleman to appear for Court hearings;

l.  Repeated anonymous reports of neglect, drug use and abuse; and

m.  Repeated concerns raised by Devereux school.

293.    Despite these dangerous conditions, DCF placed D.A., J.A. and M.A. within the care of Almond and Coleman.

294.    DCF Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

a.  The duty to reasonably supervise, monitor, and communicate with the brothers

b.  The duty to recognize and respond appropriately to a multitude of clear signs of abuse and neglect;

c.  The duty to reasonably perform clinical formulation, assessment, case planning, make reasonable case decisions, and ensure effective provision of services,

d.  The duty to facilitate reasonable transition;

e.  The duty to identify and locate kin, to prioritize kinship placement and to provide notice of removal to kin;

f.  The duty to provide the boys with notice of their rights before service reduction and termination;

g.  The duty to ensure access to healthcare; and

h.  Additional negligence, gross negligence, and recklessness.

295.    As a proximate result of DCF Defendants' failures detailed herein, DCF by and through its employees removed D.A., J.A. and M.A. from the relative safety of their placement at a residential treatment center and placed them into an actual house of horrors where D.A. and M.A. were severely abused and neglected, starved, drugged, deprived of access to other potential intervenors, deprived of access to and connection with kin, deprived of the therapy and medical care necessary for treatment and management of their disabilities, deprived of an adequate education, and otherwise left with completely inadequate care and supervision as children with disabilities.

296.    DCF Defendants' gross wanton negligence caused J.A.'s and especially M.A.'s torture, abuse, and neglect and J.A. and M.A.'s loss of consortium via their access to each other which was a reasonably foreseeable result of DCF Defendants' failure to perform their duties.

## <u>COUNT III</u>
### *Negligent and Reckless Infliction of Emotional Distress to M.A. and J.A. v. all Defendants*

297.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

298.    Defendants, as members of various state agencies tasked with supervising and ensuring the safety of M.A. and J.A., all had a duty to M.A. and J.A. from any foreseeable harm posed by unsafe home environments.

299.    Under M.G.L. c. 119 § 1, state agencies tasked with the protection of children in the Commonwealth have a duty to assure good substitute parental care in the event of there being destructive or abusive parents.[5]

---

[5] M.G.L. c. 119 § 1 states that: "the purpose of this chapter is to insure that the children of the commonwealth are protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes, and to assure good substitute parental care in the event of the absence, temporary or permanent inability or unfitness of parents to provide care and protection for their children."

300.     Defendants breached this duty by negligently and/or recklessly intervening in the boys' lives, and  repeatedly placing them in a wholly unfit and dangerous home with adults with known criminal and substance abuse histories despite repeated and ample warnings concerning the dangerous environment in the home;[6] making insufficient efforts to protect and supervise the boys while they were starving and being denied basic care; failing to recognize neglect and abuse; and failing to assure students were participating in education, among other negligent and/or reckless acts.

301.     J.A. experienced such extreme emotional distress from DCF Defendants' negligent and/or reckless placement in an unfit, improper, and abusive home that he experienced a behavior escalation and physical altercation.

302.     J.A. was withheld from his identical triplet siblings.

303.     M.A. and D.A. were forced to transition too quickly and without adequate support and protection to live in an unfit home with abusers where they were starved and later found emaciated and with fentanyl in their systems.

304.     As a result of the Defendants' failure to intervene and remove J.A. and M.A. from this dangerous environment, J.A. and M.A. were caused to witness the abuse and neglect of their brothers which caused significant distress and emotional injury, all as a result of the acts and omissions of the Defendants.

---

[6] During the first home day visit for the triplets on January 10, 2020, Mr. Almond's live-in girlfriend, Ms. Coleman, expressed concern to the DCF case management team that reunification was moving too fast and that the family was not ready for overnight visits with the triplets because the apartment was too small. *Office of the Child Advocate (OCA) Investigative Report, March 2021, pg. 14.* Additionally, the triplet's congregate care provider sent the DCF Fall River Area Office a letter opposing D.A. and M.S.'s reunification citing numerous concerns. *Id. at pg. 15* [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

305.    As a result of the Defendants' failure to intervene and remove M.A. from this dangerous environment, M.A. was caused to witness the death of his brother D.A. at the hands of his supposed care givers, his father and his girlfriend.

306.    J.A. and M.A. suffered significant damage as a result of the Defendants' acts and omissions.

307.    J.A. and M.A.'s resulting emotional distress was so severe and debilitating that it manifested in physical symptoms.

## COUNT IV
### Americans with Disabilities and Rehabilitation Act
### J.A., M.A., D.A. v. DCF and Commonwealth Defendants

308.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

309.    Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. §12132, and its enabling regulations, 28 C.F.R. 35.101 *et seq.*, prohibit discrimination against individuals with disabilities including exclusion from participating in, or denying the benefits of, the goods, services, programs and activities of the entity.

310.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a)[[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs]; *see also* 34 C.F.R. §104.4(a)[Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].

46

311.    Accordingly, DCF must provide children with disabilities an equal opportunity to access child protection and foster care services as it provides to children without disabilities.

312.    Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

313.    An "individual with a disability" is defined by reference to the Americans with Disabilities Act ("ADA") as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." A "qualified individual with a disability" is one who, with or without reasonable accommodation for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance.

314.    D.A., J.A. and M.A. each qualify as "individual[s] with a disability" as defined by reference to the Americans with Disabilities Act ("ADA"). The ADA defines a child with a disability as "a child with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services." Further, they qualify as "otherwise qualified individuals with a disability" under the Rehabilitation Act, 29 U.SC. §794; 29 U.SC. §705(20).

315.    D.A., J.A., and M.A. were/are qualified individuals with disabilities.

316.    DCF is a public entity under the definition of 42 U.S.C. §12132. DCF also receives federal financial assistance and is thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. §794(b); 34 C.F.R. 104.51. Defendants Healey, Walsh, and Miller are sued in their official capacities as state officials responsible for administering and/or supervising Massachusetts programs and activities related to child welfare and foster care services.

317.    DCF failed to provide meaningful access to DCF services by not implementing accommodations for D.A., M.A., and J.A.'s disabilities.

318.    D.A., M.A., and J.A. were excluded from participation and denied the benefits and services of DCF or otherwise discriminated against to include, but not limited to the following:

    a.    Deprived of permanency planning;
    b.    family-based placements;
    c.    transition and reunification services;
    d.    supervision and welfare investigation services;
    e.    accommodations due to disability;
    f.    safety; and
    g.    adequate communication.

319.    DCF's exclusion and discrimination was due to D.A., J.A., and M.A.'s disability.

320.    Due to DCF's exclusion and discrimination, D.A., J.A., and M.A. were caused to suffer extreme harm, including death, due to the Defendants' failures.

## COUNT V
### *Americans with Disabilities and Rehabilitation Act*
### *M.A., D.A. v. FRPS and Commonwealth Defendants*

321.    Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

322.    Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. §12132, and its enabling regulations, 28 C.F.R. 35.101 *et seq.*, prohibit discrimination against individuals with

disabilities including exclusion from participating in, or denying the benefits of, the goods, services, programs and activities of the entity.

323.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its implementing regulations provide, "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794(a)[[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs]; *see also* 34 C.F.R. §104.4(a)[Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].

324.     Accordingly, FRPS must provide children with disabilities an equal opportunity to access educational services as it provides to children without disabilities.

325.     Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

326.     FRPS is a public entity under the definition of 42 U.S.C. §12132. FRPS is also a recipient of federal financial assistance, including federal financial assistance provided to the district's schools and special education and Section 504 programs and is thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. §794(b); 34 C.F.R. 104.51. Defendants Healey and Pontes are sued in their official capacities as state officials responsible for administering and/or supervising Fall River Public School programs and activities.

327.    A "program or activity" includes local education agencies, public boards of education, and school systems.[7] FRPS is a "program or activity."[8]

328.    FRPS is an entity subject to the non-discrimination requirements of Section 504.

329.    Section 504 requires recipients of federal funding to:

    a.  Provide an appropriate education to all qualified handicapped persons who are in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

    b.  Not discriminate against a qualified individual;

    c.  Provide equal opportunity to qualified persons with disabilities to participate in or benefit from any aid, benefit, or service they make available; and

    d.  Establish and maintain procedures to ensure that children with disabilities and their custodians are guaranteed procedural safeguards with respect to the provision of FAPE.

330.    An "individual with a disability" is defined by reference to the Americans with Disabilities Act ("ADA") as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." A "qualified individual with a disability" is one who, with or without reasonable accommodation for their disability, meets essential eligibility requirements to receive services from or participate in the programs or activities of a recipient of Federal financial assistance.

331.    D.A. and M.A. each qualify as "individual[s] with a disability" as defined by reference to the Americans with Disabilities Act ("ADA"). The ADA defines a child with a disability as "a child with intellectual disabilities, hearing impairments (including deafness), speech or language

---

[7] 29 U.S.C. §794(b)(2)(B)[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs], referencing 20 U.S.C. §7801(26)[strengthening and improvement of elementary and secondary schools]. A "recipient of federal financial assistance" is a public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 34 C.F.R. §104.3(f) [Office of Civil Rights; Department of Education; Nondiscrimination on the basis of Handicap in programs or activities receiving federal financial assistance].
[8] See 29 U.S.C. § 794(b)(2)(B)[Section 504 of the Rehabilitation Act; nondiscrimination under federal grants and programs], referencing 20 U.S.C. §7801(26)[strengthening and improvement of elementary and secondary schools].

impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and who, by reason thereof, needs special education and related services."

332.    D.A. was regarded as a child with disabilities based on developmental impairments. D.A. had autism spectrum disorder that would qualify him as meeting the definition of disability.

333.    M.A. is regarded as a child with disabilities based on developmental impairments. M.A. has autism spectrum disorder that would qualify him as meeting the definition of disability.

334.    D.A. and M.A. were enrolled in FRPS from March 17, 2020 until the time of D.A.'s death on October 21, 2020.

335.    FRPS and its employees' refusal to provide appropriate communication options to D.A. and M.A. discriminated against D.A. and M.A. as people with disabilities who required accommodations, denied them a free appropriate public education as compared to their non-disabled peers.

336.    FRPS and its employees' refusal to provide appropriate communication options to D.A. and M.A. was illegal disability-based discrimination that violated Section 504 of Rehabilitation Act of 1973.

337.    FRPS and its employees' discrimination was intentional as FRPS and its employees knowingly failed to engage D.A. and M.A. between March 2020 and October 2020.

338.    Defendant FRPS was on notice of D.A. and M.A.'s need for special education services. Therefore, FRPS had knowledge of D.A. and M.A.'s disabilities and failed to act on that knowledge in direct violation of Section 504 of the Rehabilitation Act of 1973.

339.    Instead of evaluating D.A. and M.A., attempting to understand the manifestations of their respective disabilities, and providing them with reasonable accommodations for purposes

of accessing their education, the defendants intentionally chose to ignore and discriminate against D.A. and M.A.

340.    As a direct and proximate result of Defendants' conscious disregard and discrimination, D.A and M.A were excluded from participation in and denied the benefits of FRPS programming and a free appropriate public education. Such a result was entirely foreseeable.

341.    Defendants acted with deliberate indifference when they failed to have any contact with D.A. and M.A. or deliver any of the accommodations in accordance with Section 504 procedures, even though they were on notice that both D.A. and M.A. were qualified individuals with a disability.

342.    As a direct and proximate result of D.A. and M.A.'s deprivation of special education services, D.A. and M.A. suffered physical manifestations of their psychological injuries, severe emotional distress, and mental anguish and injury to their educational process.

343.    As the proximate cause of these violations of Section 504, D.A. and M.A. suffered harm as set forth above.

## COUNT VI
### *Violation of 42 U.S.C. §1983 - "Special Relationship" Theory*
### *D.A., J.A. and M.A. v. Does in their Individual Capacities (Individual Defendants)*

344.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

345.    Individual Defendants were acting under color of law.

346.    While the Plaintiffs were in the legal custody and formal supervision of DCF, they enjoyed a "special relationship" with the state, as they were in the state's custody and supervision.

347.    At the time that D.A., M.A. and J.A. were removed from Almond's custody in October 2017 and taken into DCF custody, the individual defendants were on notice that Almond's apartment was not a safe living environment for D.A., M.A., and J.A.

348.     Throughout the course of DCF's decision to place D.A., M.A., and J.A. with Almond, DCF was deliberately indifferent to the Plaintiffs, ignoring a Juvenile Court finding that Mr. Almond was unfit to care for the triplets and finding them in need of care and protection, alarming reports from parenting support service providers, congregate care providers, an anonymous abuse and neglect report, and the boys themselves, and failing to take any action to protect the safety of the Plaintiffs.

349.     The DCF Defendants failed to provide the Plaintiffs with a safe living environment, failed to provide them with services necessary for the children's physical and psychological well-being and their disabilities, and failed to provide the treatment, care, and accommodations consistent with the purpose of the child protection system.

350.     In March 2020, J.A. again returned to congregate care as a result of his own self advocacy. Individual defendants were deliberately indifferent to J.A.'s reports of abuse and neglect and caused him severe emotional distress by permitting his triplet siblings to remain in the home.

351.     The individual Defendants' conduct proximately caused the Plaintiffs' injuries.

352.     The Individual Defendants' conduct shocks the conscience.

353.     The actions of these Individual DCF Defendants, both separately and in combination, amount to a violation of the Plaintiffs' exercise or enjoyment of rights secured by the United States Constitution or laws of the United States, and of rights secured by the Massachusetts Constitution and laws. The actions of these individual DCF workers have proximately caused personal injuries to the Plaintiffs including death, severe malnutrition and other physical harm, severe and permanent mental distress and emotional harm, as well as other consequential damages.

354.     Defendants' failures as detailed herein, deprived D.A., J.A. and M.A. of their rights to due process and equal protection guaranteed by the Fourteenth Amendment to the Constitution.

## COUNT VII
### *Violation of 42 U.S.C. §1983 – State-Created Danger*
### *D.A., J.A. and M.A. v. Does in their Individual Capacities (Individual Defendants)*

355.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

356.    Individual Defendants were acting under the color of law.

357.    Defendants' failures as detailed herein deprived D.A., J.A. and M.A. of their rights to due process and equal protection guaranteed by the Fourteenth Amendment to the Constitution.

358.    Individual defendants engaged in deliberately indifferent affirmative conduct that foreseeably placed Plaintiffs in danger of private violence and/or psychological distress by placing D.A., M.A., and J.A. with Almond, Coleman, and Shadburn, and once placed, by permitting Almond and Coleman to decline DCF supervision visits, by accepting reports of D.A. sustaining severe physical injuries and illness, approving of Coleman's efforts to prevent D.A. and M.A. from speaking with DCF workers and other providers, by accepting D.A. and M.A.'s clear distress during virtual visits, by declining to investigate an abuse and neglect report, and by deciding not to remove the children from the home even though they were aware the children were experiencing physical violence and neglect. Individual defendants acted recklessly in conscious disregard of the known risks to Plaintiffs.

359.    The conduct of the Individual Defendants, as alleged above, shocks the conscience.

360.    As a direct and proximate result of the actions of these Individual Defendants, the Plaintiffs have suffered extreme harm including death, severe malnutrition and physical injury, severe and permanent mental distress and emotional harm, as well as other consequential damages.

## COUNT VIII
### *Negligence and Gross Negligence*
### *D.A. and M.A. v. FRPS Defendants*

361.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

362.    FRPS Defendants breached their duty to D.A. and M.A. to reasonably supervise, monitor and protect them.

363.    FRPS and its employees and/or agents completely failed to engage, interact with, and communicate with D.A. or M.A. for over seven months.

364.    FRPS Defendants had actual knowledge of a substantial risk of serious harm.

365.    FRPS Defendants failed to exercise due care and violated multiple affirmative duties under state and federal law and policy, including but not limited to:

    a.  The duty to provide a "free appropriate public education" to children with disabilities as required by Section 504 of the Americans with Disabilities Act (ADA), the Individuals with Disabilities Education Act (IDEA), and the Massachusetts Special Education Statute, M.G.L. c. 71B, §1, et seq.;

    b.  The duty to supervise and train; and

    c.  The duty to fulfill a mandatory reporting obligation pursuant to M.G.L. c. 119, §51A.

366.    The failures to engage with students enrolled in their educational program and failure to report educational neglect breached the school's express duty to document each child's "growth in the acquisition of knowledge and skills, including social/emotional development" as required by law.

367.    The failure to make any direct or virtual connection with D.A. and M.A. deprived these two autistic children of any ability or opportunity to engage with their teachers and support staff so that, at a bare minimum, these school employees would see what was very obviously there to be seen – two severely malnourished, abused, and neglected special needs children who had no ability to advocate for themselves.

368.    These failures caused serious injury to D.A. and M.A. and such injuries were entirely foreseeable.

## Count IX
### *Violations of M.G.L. c. 93 § 103*
### *D.A. and M.A. v. FRPS Defendants*

369.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

370.    M.G.L. c. 93 § 103 (a) prohibits discrimination based upon disability and provides that a handicapped person shall "have the same rights as other persons" and to enjoy "the full and equal benefit of all laws and proceedings for the security of persons and property, including but not limited to, the rights secured under Article CXIV of the Amendments to the Massachusetts Constitution."[9]

371.    Additionally, M.G.L. c. 93 § 103 (b) states that "any person whose rights under the provisions of subsection (a) have been violated may commence a civil action for injunctive and other appropriate equitable relief, including, but not limited to, the award of compensatory damages."

372.    M.G.L. c. 93 § 103 (c) further states that "a violation of subsection (a) shall be established if, based upon the totality of the circumstances, it is shown that any individual is denied any of the rights protected by subsection (a)."

373.    Article CXIV of the Amendments to the Massachusetts Constitution provides that "no otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."

---

[9] M.G.L. c. 93 § 103 (a) defines handicap by reference to the definition contained within M.G.L. c. 151B, § 1, which states that "handicap means: a) a physical or mental impairment which substantially limits 1 or more major life activities of a person; b) a record of having such impairment; c) being regarded as having such impairment…."

374.     D.A. is regarded as a child with disabilities based on developmental impairments. D.A. had autism spectrum disorder that would qualify him as meeting the definition of disability under Massachusetts law.

375.     M.A. is regarded as a child with disabilities based on developmental impairments. M.A. has autism spectrum disorder that would qualify him as meeting the definition of disability under Massachusetts law.

376.     D.A. and M.A. were enrolled in FRPS from March 17, 2020 until the time of D.A.'s death on October 21, 2020.

377.     During this time period, both D.A. and M.A. were entitled to, and received individualized education programs (IEPs).

378.     An IEP is a plan or program that is developed to ensure that students with learning disabilities who are attending an elementary or secondary educational institution receive specialized educational instruction that is tailored to their specific educational needs.

379.     During this time, both D.A. and M.A. were entitled to receive education and special education accommodations.

380.     Both D.A. and M.A.'s IEPs contained detailed descriptions of D.A. and M.A.'s autistic condition.

381.     Because FRPS were in possession of both D.A. and M.A.'s IEPs, FRPS was aware at all times of the extensive supervision and assistance that both D.A. and M.A., as disabled students, would need to meet their educational goals.

382.     Additionally, under Massachusetts state law, FRPS, as a public school, was at all times mandated to report instances of child abuse and neglect.[10]

---

[10] M.G.L. c. 119 § 51A (a) states that: "a mandated reporter shall immediately communicate with the department orally and shall, within 48 hours, file a written report with the department detailing suspected abuse or neglect if, in their

383.     Despite having access to both D.A and M.A.'s IEPs, FRPS staff never attempted to speak to D.A. or M.A. over the phone or in person to assess their educational progress or conditions generally.

384.     FRPS failed to recognize D.A. and M.A.'s lack of engagement and failed to take any steps in furtherance of understanding or reporting their absences.

385.     Furthermore, FRPS did not contact Mr. Almond regarding the creation of a Special Education Learning Plan as required during the COVID-19 pandemic.

386.     During their enrollment with FRPS, neither D.A. nor M.A. logged into remote learning sessions nor did they complete any of the paper assignment/learning packets that the school supplied them with.[11]

387.     During this time, there was no school services or academic support offered to D.A. or M.A. verbally or over the phone nor did FRPS follow up with work via paper packets or any other possible educational plan or special education services.

388.     FRPS did not consider how the continuous delays in providing critical special education services to these children may affect the risks to the children's safety.[12]

389.     Based upon the totality of circumstances, D.A. and M.A. were denied rights protected by Massachusetts law.

390.     Because of their disabilities, D.A. and M.A. could not advocate for themselves.

391.     Because of their disabilities, D.A. and M.A. suffered from the repeated failures of FRPS and were denied their rights to education and their rights to be safe from harm.

---

professional capacity, they have reasonable cause to believe that a child is" (i) suffering physical or emotional injury resulting from the abuse inflicted upon them which causes harm or substantial risk of harm to the child's health or welfare including, but not limited to, sexual abuse;(ii) suffering physical or emotional injury resulting from neglect including, but not limited to, malnutrition…"

[11] OCA Report, pg. 65 [All exhibits will be made available upon request as they contain sensitive material that may be subject to protection].

[12] *Id,.* at pg. 68.

## Count X
### *Violations of M.G.L. c. 93 § 103*
### *D.A., J.A. and M.A. v. DCF, Commonwealth and Individual Defendants*

392.    The Plaintiffs repeat and reallege here all prior paragraphs of this Complaint.

393.    M.G.L. c. 93 § 103 (a) prohibits discrimination based upon disability and provides that a handicapped person shall "have the same rights as other persons" and to enjoy "the full and equal benefit of all laws and proceedings for the security of persons and property, including but not limited to, the rights secured under Article CXIV of the Amendments to the Massachusetts Constitution."[13]

394.    Additionally, M.G.L. c. 93 § 103 (b) states that "any person whose rights under the provisions of subsection (a) have been violated may commence a civil action for injunctive and other appropriate equitable relief, including, but not limited to, the award of compensatory damages."

395.    M.G.L. c. 93 § 103 (c) further states that "a violation of subsection (a) shall be established if, based upon the totality of the circumstances, it is shown that any individual is denied any of the rights protected by subsection (a)."

396.    Article CXIV of the Amendments to the Massachusetts Constitution provides that "no otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth."

---

[13] M.G.L. c. 93 § 103 (a) defines handicap by reference to the definition contained within M.G.L. c. 151B, § 1, which states that "handicap means: a) a physical or mental impairment which substantially limits 1 or more major life activities of a person; b) a record of having such impairment; c) being regarded as having such impairment…."

397.    D.A., J.A. and M.A. were all regarded as children with disabilities based on developmental impairments. All are/were on the autism spectrum disorder spectrum that would qualify them as meeting the definition of disability under Massachusetts law.

398.    Defendants failed to provide meaningful access to DCF services by not implementing accommodations for D.A., M.A., and J.A.'s disabilities, failed to protect the boys from harm and failed to properly monitor and supervise those directly responsible for the care and maintenance of D.A., M.A. and J.A.

399.    D.A., M.A., and J.A. were excluded from participation and denied the benefits and services of DCF or otherwise discriminated against to include, but not limited to the following:

    h.  Deprived of permanency planning;
    i.  family-based placements;
    j.  transition and reunification services;
    k.  supervision and welfare investigation services;
    l.  accommodations due to disability;
    m.  safety; and
    n.  adequate communication.

400.    Defendants' exclusion and discrimination was due to D.A., J.A., and M.A.'s disabilities.

401.    Based upon the totality of circumstances and due to Defendants' exclusion and discrimination, D.A., J.A., and M.A. were caused to suffer extreme harm, including death.

**WHEREFORE, Plaintiffs respectfully request the following relief:**

A.  An order impounding all pleadings and documents filed with the Court revealing D.A., J.A., and M.A.'s identities or actual names;

B.  An award to the Plaintiffs of damages in an amount sufficient to compensate them for their injuries, including, but not limited to, past, present, and future physical and psychological injuries, pain and suffering, past, present, and future emotional distress, impaired earning capacity, past, present, and future medical expenses, loss of income, and other damages;

C.  An award to the Plaintiffs of punitive or exemplary damages as permitted by law;

D.  An award to the Plaintiffs of their attorneys' fees, costs, and interest as permitted by law;

E.  Such further and other relief as may be just and proper.

## DEMAND FOR JURY TRIAL

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

Respectfully Submitted,

Stephan Hanna, Personal Representative of the Estate of D.A., and Conservator for J.A. and M.A.

Plaintiffs,

By their attorneys,

Paula S. Bliss, Esq., BBO#652361
Kimberly Dougherty, Esq., BBO# 658014
Justice Law Collaborative, LLC
210 Washington St.
North Easton, MA 02356
(508) 230-2700
paula@justiclc.com
kim@justiclc.com

Dated: February 10, 2025